**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| HOTALING & CO., LLC and SANNITI LLC, | Civil No.: 20-cv-18718 (KSH) (CLW) |
| *Plaintiffs/Counterclaim Defendants*, | |
| v. | |
| BERRY SOLUTIONS INC. d/b/a SUPREME SUPPLIERS and EMC GROUP INC., | **OPINION** |
| *Defendant/Counterclaim Plaintiffs*. | |

**Katharine S. Hayden, U.S.D.J.**

**I.    Introduction**

This matter arises from the alleged unlawful importation, marketing, and sale of Luxardo brand cherries ("Luxardo cherries"), high-end maraschino cherries manufactured in Italy.

Hotaling & Co., LLC ("Hotaling") is the exclusive United States importer of Luxardo cherries, and Sanniti LLC ("Sanniti") sells them to consumers through Amazon. Hotaling and Sanniti sued EMC Group Inc. ("EMC") and Berry Solutions Inc. d/b/a Supreme Suppliers ("Supreme Suppliers") for the alleged unlawful importation, marketing, and sale of "gray market" Luxardo cherries on Supreme Suppliers' Amazon storefront. After moving unsuccessfully to dismiss the lawsuit against them, EMC and Supreme Suppliers filed an answer with affirmative defenses and asserted four counterclaims.[1] Presently before the Court is Hotaling and Sanniti's motion to dismiss two of those counterclaims for tortious interference and

---

[1] EMC and Supreme Suppliers also asserted counterclaims against non-party Girolamo Luxardo S.P.A. ("Girolamo"). After this motion was filed, they formally moved to add Girolamo as a party. (D.E. 52.) Girolamo has moved to dismiss the counterclaims against it should that motion be successful. (D.E. 45.) Both motions will be addressed in a separate opinion.

1

defamation and to strike the "first sale" affirmative defense under Fed. R. Civ. P. 12(b)(6) and 12(f). (D.E. 31.) For the reasons that follow, the motion is granted in part and denied in part.

## II.   Background

The Court gave a detailed factual recitation in its October 19, 2021 opinion denying EMC and Supreme Suppliers' motion to dismiss and assumes the parties are familiar with it. The facts relevant to the instant motion are derived from their counterclaim. (D.E. 27, Counterclaim.)

Hotaling and Sanniti are, respectively, the United States importer and an authorized distributor of Luxardo cherries. (Counterclaim ¶¶ 3-4, 10-11.) Non-party Girolamo, an Italian corporation, owns the trademarks for the Luxardo cherries. (*Id.* ¶¶ 5, 12.) EMC is a distributor of consumer products, which Supreme Suppliers resells for a profit through various channels including Amazon. (*Id.* ¶¶ 13-15.) Supreme Suppliers has served thousands of customers on its "successful and reputable" Amazon storefront, which produces a significant portion of its revenue. (*Id.* ¶¶ 16, 24, 27.)

In their counterclaim, EMC and Supreme Suppliers allege that Hotaling and Sanniti have "engaged in a coordinated effort" to prevent third parties like Supreme Suppliers from selling Luxardo cherries on Amazon and other online platforms by making false and defamatory complaints of intellectual property infringement. (*Id.* ¶¶ 32-33.) Specifically, they allege that Hotaling and Sanniti knowingly filed false complaints with Amazon claiming that Supreme Suppliers was selling counterfeit and infringing Luxardo cherries on its storefront. (*Id.* ¶¶ 43-44.) The false complaints were allegedly designed to damage Supreme Suppliers' reputation and goodwill, so that Amazon would suspend or terminate their relationship per its "notice and takedown" intellectual property infringement procedures, giving Sanniti a competitive advantage. (*Id.* ¶¶ 34, 38-40.) They further allege that as a result, Amazon suspended Supreme

Suppliers' listings for Luxardo cherries, causing "an immediate loss of revenue." (*Id.* ¶ 62.)

This motion (D.E. 31) is directed to the answer and counterclaim filed after EMC and Supreme Suppliers unsuccessfully moved to dismiss the complaint, and addresses the tortious interference and defamation counterclaims as well as the "first sale" affirmative defense. The record consists of the parties' briefs (D.E. 31-1, Mov. Br; D.E. 33, Opp. Br.; D.E. 34, Reply Br.) and a notice of supplemental authority (D.E. 53) regarding Judge Vazquez's recent opinion in *Hotaling & Co., LLC v. LY Berditchev Corp.*, 2022 WL 1134851 (D.N.J. Apr. 18, 2022), which addressed a similar motion in a case against a different reseller of Luxardo cherries.

### III.  Motion to Dismiss Counterclaims

#### a.  Standard of Review

In ruling on motions to dismiss a counterclaim, courts use the familiar Rule 12(b)(6) standard applicable to motions to dismiss a complaint. *See TSMA Franchise Sys., Inc. v. TS of Kings Highway Inc.*, 2022 WL 1602137, at *2 (D.N.J. May 20, 2022) (Vazquez, J.). To withstand a motion under Rule 12(b)(6), the counterclaim "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face,'" meaning the counter-plaintiff has pleaded "factual content that allows the court to draw the reasonable inference that the [counter-]defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Accordingly, the counter-plaintiff must "plead more than the possibility of relief." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009). The Court will "disregard legal conclusions and 'recitals of the elements of a cause of action, supported by mere conclusory statements.'" *Santiago v. Warminster Twp.*, 629 F.3d 121, 128 (3d Cir. 2010) (quoting *Iqbal*, 556 U.S. at 678).

### b. Privilege

Hotaling and Sanniti first argue that the tortious interference and defamation counterclaims should be dismissed on grounds that their complaints to Amazon are privileged. They rely on the litigation and common interest privileges which, the parties agree, are affirmative defenses. *See JNL Mgmt., LLC v. Hackensack Univ. Med. Ctr.*, 2019 WL 1951123, at *7 (D.N.J. May 2, 2019) (Salas, J.). As the proponents, Hotaling and Sanniti "have the burden of establishing that the existence of these privileges is 'apparent from the face of the complaint.'" *Id.* at *8 (quoting M*angan v. Corp. Synergies Grp., Inc.*, 834 F. Supp. 2d 199, 209 (D.N.J. 2011) (Simandle, J.)); *accord Bethel v. Jendoco Const. Corp.*, 570 F.2d 1168, 1174 n. 10 (3d Cir. 1978) ("[A]n affirmative defense may be raised on a 12(b)(6) motion if the predicate establishing the defense is apparent from the face of the complaint.").

"New Jersey's litigation privilege applies to 'any communication (1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that have some connection or logical relation to the action.'" *Allen ex rel. Martin v. LaSalle Bank, N.A.*, 629 F.3d 364, 369 (3d Cir. 2011) (quoting *Hawkins v. Harris*, 141 N.J. 207, 216 (1995)). Here, Hotaling and Sanniti cite two unpublished cases—one from the Central District of California and one from this District—which purportedly support the position that "the Amazon notice and takedown procedures qualify as quasi-litigation procedures to which the litigation privilege applies." (Mov. Br. at 8.) While that may be true under the unique circumstances in those cases, the Court is unconvinced that the same rationale applies here.

In *TP Link USA Corp. v. Careful Shopper LLC*, 2020 WL 3063956 (C.D. Cal. Mar. 23, 2020), Careful Shopper, a third-party seller on Amazon, was sued for its online sale of

4

purportedly counterfeit goods.  Careful Shopper asserted a tortious interference counterclaim that TP Link moved to dismiss on privilege grounds under California's anti-SLAPP statute, which "aims to identify, early in the litigation process, meritless first amendment cases aimed at chilling expression through costly, time-consuming litigation." *Id.* at *3 (internal citations and quotations omitted).  The court began its analysis with the observation that "the litigation privilege is intended to protect the sort of communication at issue here, the reporting of suspected wrongdoing to a party capable of halting or remedying it," *id.* at *9, which would favor a finding of privilege in the instant case.  But the rest of the court's privilege analysis was largely tailored to the anti-SLAPP statute.

`        Hotaling and Sanniti concede that no such statutory scheme governs here, and instead argue that the rationale in *TP Link* "is equally relevant here even without a New Jersey anti-SLAPP statute." (Reply Br. at 5-6.)  Without any in-Circuit authority to support it, that argument is unavailing.  Indeed, Judge Vazquez addressed the issue and declined to apply the litigation privilege under analogous circumstances.  *See LY Berditchev Corp.*, 2022 WL 1134851, at *3.  Satisfied from its own research that the issue is far from settled, this Court will follow suit.

Judge Kugler addressed a tortious interference counterclaim in *TD Bank, N.A. v. Hill*, 2014 WL 413525 (D.N.J. Feb. 3, 2014), where an author was sued for allegedly infringing a copyrighted book manuscript.  The defendant asserted a tortious interference counterclaim on grounds that TD Bank had sent notices to Amazon and other retailers urging them to cease selling his book for copyright infringement.  Judge Kugler found that TD Bank could seek refuge under the litigation privilege, reasoning that the retailer notices were communications "made in connection with judicial proceeding[s]" because they were sent by "a litigant" the day *after* TD Bank filed its copyright infringement lawsuit.  *Id.* at *6.  Here, Hotaling and Sanniti appear to

5

concede that they made their complaints to Amazon *before* they filed this lawsuit, and argue instead that the timing is irrelevant.[2] (*See* Reply Br. at 5.) Even so, they have not pointed to anything in the pleadings which would suggest that their complaints were made with an eye toward litigation. *See JNL Mgmt.*, 2019 WL 1951123, at *7 (proponent of affirmative defense bears burden of establishing privilege is "apparent from the face of the complaint"). Accordingly, they have failed to satisfy their burden of demonstrating the applicability of the litigation privilege.

The Court next turns to the common interest privilege, which has been defined as follows:

> A communication "made bona fide upon any subject-matter in which the party communicating has an interest, or in reference to which he has a duty, is privileged if made to a person having a corresponding interest or duty, although it contains criminatory matter which, without this privilege, would be slanderous and actionable[.]"

*Pro. Recovery Servs., Inc. v. Gen. Elec. Cap. Corp.*, 642 F. Supp. 2d 391, 400 (D.N.J. 2009) (Simandle, J.) (quoting *Williams v. Bell Tel. Lab. Inc.*, 132 N.J. 109, 121 (1993)). Accordingly, the Court must analyze: "(1) the appropriateness of the occasion on which the defamatory information is published, (2) the legitimacy of the interest thereby sought to be protected or promoted, and (3) the pertinence of the receipt of that information by the recipient." *Id.* at 401.

Hotaling and Sanniti do not attempt to explain how these factors are satisfied, arguing instead, in a barebones fashion, that they share a common interest with Amazon in "ensuring that infringing . . . products are not sold on the Amazon platform and that products sold on the

---

[2] The counterclaim alleges that Hotaling and Sanniti complained to Amazon on October 20, 2021 and October 21, 2020. (*See* Counterclaim ¶ 56.) The 2021 date appears to be a typographical error, as they do not dispute that their Amazon complaints predate this action. (*See* Reply Br. at 5 ("The communications at issue here are also privileged as they were made by a soon-to-be litigant[.]").

6

Amazon platform to United States consumers are safe and comply with United States labeling laws." (Mov. Br. at 9; *see also* Reply Br. at 6-7.) Unsurprisingly, they have not cited any cases in which the common interest privilege was applied under similar circumstances, nor has the Court found any. The Court moves on to analyze the challenged counterclaims on their merits.

### c. Tortious Interference with Contract and Business Relations

The Court begins with EMC and Supreme Suppliers' counterclaim for tortious interference with contract and business relations, which is premised on Supreme Suppliers' "advantageous" business and contractual relationship with Amazon. (Counterclaim ¶¶ 87-88.) The counterclaim alleges that Hotaling and Sanniti "intentionally and improperly interfered" with, and ultimately disrupted, that relationship by charging Supreme Suppliers with the sale of counterfeit Luxardo cherries. (*Id.* ¶¶ 91-92.)

#### i. Tortious Interference with Contract

To assert a claim for tortious interference with contract under New Jersey law, a plaintiff must allege "(1) an existing contractual relationship; (2) intentional and malicious interference with that relationship; (3) loss or breach of a contract as a result of the interference; and (4) damages resulting from that interference." *Fid. Eatontown, LLC v. Excellency Enter.*, LLC, 2017 WL 2691417, at *6 (D.N.J. June 22, 2017) (Martinotti, J.) (quoting *DiGiorgio Corp. v. Mendez & Co., Inc.*, 230 D. Supp. 2d 552, 558 (D.N.J. 2002) (Walls, J.)); *accord Printing Mart-Morristown v. Sharp Elecs. Corp.*, 116 N.J. 739, 751-52 (1989).

Hotaling and Sanniti argue that the second factor has not been met, as the counterclaim does not allege "anything that amounts to improper, malicious interference." (Mov. Br. at 10.) To demonstrate "malice," a plaintiff must allege that the harm was inflicted "intentionally and without justification or excuse." *MacDougall v. Weichert*, 144 N.J. 380, 404 (1996) (quoting

7

*Printing Mart-Morristown*, 116 N.J. at 751); *see Austar Int'l Ltd. v. AustarPharma LLC*, 425 F. Supp. 3d 336, 359 (D.N.J. 2019) (McNulty, J.) ("Although the common meaning of malice connotes ill-will toward another person, . . . malice in the legal sense is the intentional doing of a wrongful act without justification or excuse." (internal citations and quotations omitted)). A defendant "claiming a business-related excuse must justify not only its motive and purpose, but also the means used." *Lamorte Burns & Co. v. Walters*, 167 N.J. 285, 307 (2001). In that regard, a court will analyze "whether the conduct was sanctioned by the 'rules of the game.'" *Id.* at 306. Accordingly, the "line clearly is drawn at conduct that is fraudulent, dishonest, or illegal." *Id.* at 307 (citing *Ideal Dairy Farms, Inc. v. Farmland Dairy Farms, Inc.*, 282 N.J. Super. 140, 205 (App. Div. 1995)).

Here, the parties sharply dispute the authenticity of Supreme Suppliers' Luxardo cherries and, consequently, the propriety of Hotaling and Sanniti's complaints to Amazon. (*Compare* D.E. 1, Compl. ¶ 36 (alleging that complaints to Amazon were based on product listings for "unauthorized" Luxardo cherries) *with* Counterclaim ¶¶ 95, 97 (alleging that Hotaling and Sanniti made "false accusations of counterfeiting and infringement" to Amazon after "perform[ing] test purchases" of Supreme Suppliers' product).) However, if as alleged Hotaling and Sanniti knew Supreme Suppliers was selling an authentic product on its storefront yet still lodged complaints to Amazon anyway, that conduct would certainly violate the "rules of the game"—particularly in light of the competitive advantage Sanniti stood to gain. (*See* Counterclaim. ¶ 11 (alleging that Sanniti, like Supreme Suppliers, sells Luxardo cherries through an Amazon storefront).) Accordingly, the counterclaim cannot be dismissed at this stage for lack of malice.

8

The Court does agree that EMC and Supreme Suppliers have failed to adequately allege the third element of a tortious interference with contract claim—*i.e.*, "loss or breach" of the contractual relationship.³ While the counterclaim generally alleges the existence of a "contractual relationship" between Supreme Suppliers and Amazon (*see* Counterclaim ¶¶ 88-89, 91), it does not allege that the relationship was lost as a result of Hotaling and Sanniti's interference. To the contrary, it claims that Supreme Suppliers' listings were merely "suspended" (*see id.* ¶¶ 93-94). Further, the counterclaim fails to describe the purported contract or otherwise provide any details regarding its terms, including how Amazon's suspension of Supreme Suppliers' listings would amount to a breach. *See loanDepot.com v. CrossCountry Mortg., Inc.*, 399 F. Supp. 3d 226, 237 (D.N.J. 2019) (McNulty, J.) (dismissing tortious interference with contract claim where plaintiff failed to allege "specific breach"); *cf. Durr Mech. Constr., Inc. v. PSEG Fossil, LLC*, 516 F. Supp. 3d 407, 422 (D.N.J. 2021) (tortious interference claim was sufficiently alleged "because it focuse[d] specifically on the [] contract"). Tellingly, the counterclaim alleges that Amazon "has a policy of *acting on virtually any notice* of intellectual property infringement, whether legitimate or not" (*see* Counterclaim ¶ 38 (emphasis added)), which weakens the argument that suspension constitutes a contractual breach.

Given the insufficiency of EMC and Supreme Suppliers' allegations regarding a breach of any contractual relationship with Amazon, their counterclaim alleging tortious interference with contract is dismissed. This does not end the analysis as to the sufficiency of their tortious

---

³ The Court notes that EMC and Supreme Suppliers have adequately pled damages by alleging, among other things, suspension of their product listings and lost revenue. *See AlphaCard Sys. LLC v. Fery LLC*, 2021 WL 2190901, at *4 (D.N.J. May 31, 2021) (Shipp, J.) (plaintiff's allegation that the reduction of the "number and variety of products it could offer" resulted in "great economic harm" was sufficient to establish damages for tortious interference claim). But this finding does not relieve them of their obligation to plead the remaining elements of a tortious interference with contract counterclaim.

9

interference pleadings, however, and the Court moves on to examine the claim of tortious interference with business relations.

### ii. Tortious Interference with Business Relations

To establish a tortious interference with business relations claim, a plaintiff must allege that: (1) it had some "reasonable expectation of economic advantage"; (2) the defendant's actions were "malicious" such that "the harm was inflicted intentionally and without justification or excuse"; (3) the interference "caused the loss of the prospective gain or there was a reasonable probability that the plaintiff would have obtained the anticipated economic benefit"; and (4) "the injury caused the plaintiff damage." *Waldman Seafood, Inc. v. Mical Seafood, Inc.*, 2014 WL 2887855, at *7 (D.N.J. June 24, 2014) (Wigenton, J.) (citing *Printing Mart-Morristown*, 116 N.J. at 751-52). Hotaling and Sanniti argue that the counterclaim fails to adequately allege malice.

Specifically, they contend that because they "have legitimate interests in protecting their business from unfair competition," their complaints to Amazon cannot be considered "wrongful activity." (Mov. Br. at 11.) But, as explained *supra*, the counterclaim alleges that Hotaling and Sanniti knew Supreme Suppliers' Luxardo cherries to be genuine, yet went ahead and filed complaints with Amazon questioning their authenticity. (Counterclaim ¶¶ 91, 97-98.) The counterclaim further alleges that Hotaling and Sanniti acted with the wrongful purpose of interfering with the business relationship between Supreme Suppliers and Amazon, which in turn "suppress[ed]" or "eliminate[d]" competition for Sanniti. (*Id.* ¶¶ 11, 70, 95.) In short, wrongful conduct undertaken with wrongful means. These allegations are sufficient to prevent dismissal of the counterclaim for want of malice, and Hotaling and Sanniti's cited authority does not

compel a contrary conclusion.[4] *See Bedwell Co. v. Camden Cnty. Improvement Auth.*, 2014 WL 3499581, at *4 (D.N.J. July 14, 2014) (Irenas, J.) (dismissing tortious interference claim where, unlike here, plaintiff failed to explain how conduct "exceed[ed] standard business morality"); *1 Reliable Transportation, Inc. v. Trader Joe's Co., Inc.*, 2020 WL 4279789, at *5 (App. Div. July 27, 2020) (per curiam) (same, where plaintiff failed to allege that purportedly malicious "action was not justified"); *see also Cargill Glob. Trading v. Applied Dev. Co.*, 706 F. Supp. 2d 563, 576 (D.N.J. 2010) (Walls, J.) (no tortious interference claim where "all that [defendant] did was to provide *truthful information* to HUD about the state of *its own business affairs*" (emphasis added)). As the business relations counterclaim is not challenged on other grounds, it survives the instant motion.

### d. Defamation

Finally, Hotaling and Sanniti seek dismissal of the defamation counterclaim, which again is premised on their "false statements to Amazon" that Supreme Suppliers was selling counterfeit and infringing Luxardo cherries on its storefront. (Counterclaim ¶¶ 103-04.) They move on grounds that those statements are both privileged and "substantially true." (Mov. Br. at 13; Reply Br. at 9-10.) As the Court has already rejected their privilege argument in Section III(b) *supra*, it will focus solely on the substantial truth argument.

---

[4] The Court also finds unpersuasive Hotaling and Sanniti's cited authority from other jurisdictions. *See iMerchandise LLC v. TSDC, LLC*, 2021 WL 1222197, at *3-6 (D. Conn. Mar. 31, 2021) (focusing on case-specific circumstances; namely, whether malice could be inferred from, *inter alia*, defendants' failure to: (i) contact plaintiffs before complaining to Amazon; (ii) sue for patent infringement; and (iii) cooperate with plaintiffs in resolving dispute); *see also RFP LLC v. SCVNGR, Inc.*, 788 F. Supp. 2d 191, 196-98 (S.D.N.Y. 2011) (dismissing tortious interference claim where, unlike here, plaintiff "provide[d] no factual enhancement that could support the allegation that" cease and desist letter was sent for the sole purpose of harming plaintiff); *Godinger Silver Art Ltd. v. Hirschkorn*, 433 F. Supp. 3d 417, 427 (E.D.N.Y. 2019) (same, where plaintiffs made "no plausible allegation that [defendant] acted for any reason other than his earnest, subjectively held belief that plaintiffs were, in fact, infringing his patents").

11

To state a defamation claim under New Jersey law, a plaintiff must demonstrate that: (1) the defendant "made a false and defamatory statement" concerning the plaintiff; (2) the statement was non-privileged and communicated to another person; and (3) the defendant "acted negligently or with actual malice." *O'Keefe v. WDC Media, LLC*, 2015 WL 1472410, at *3 (D.N.J. Mar. 30, 2015) (Cecchi, J.) (quoting *G.D. v. Kenny*, 205 N.J. 275, 292-93 (2011)). Truth may be asserted as a defense to a defamation action "even when a statement is not perfectly accurate." *Hong Zhuang v. EMD Performance Materials Corp.*, 2018 WL 3814282, at *9 (D.N.J. Aug. 10, 2018) (Martinotti, J.) (quoting *G.D.*, 205 N.J. at 310). That is because "[t]he law of defamation 'overlooks minor inaccuracies and concentrates upon substantial truth.'" *Read v. Profeta*, 397 F. Supp. 3d 597, 651 (D.N.J. 2019) (McNulty, J.) (quoting *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 516 (1991)). Accordingly, "[m]inor inaccuracies do not amount to falsity so long as the substance, the gist, the sting, of the libelous charge be justified." *Id.* (quoting *Masson*, 501 U.S. at 516).

Here, the purported falsity of Hotaling and Sanniti's statements to Amazon is buttressed by allegations elsewhere in the counterclaim that they knew Supreme Suppliers only sold genuine, non-infringing Luxardo cherries on its storefront. (*See, e.g.*, Counterclaim ¶¶ 36, 107 (alleging that Hotaling and Sanniti knew the Luxardo cherries on Supreme Suppliers' Amazon storefront were "genuine" because they performed "test purchases" on the product before complaining to Amazon, and that EMC and Supreme Suppliers were "lawfully permitted" to sell Luxardo cherries "without violating the intellectual property rights or other legal rights of" Girolamo, the trademark owner).) Assuming, as we must, the truth of those allegations, the counterclaim plausibly pleads that the "gist" of Hotaling and Sanniti's statements to Amazon was far from justified. While they may be able to prove otherwise after discovery, they cannot

rely on "substantial truth" as a basis for dismissal of the defamation counterclaim at this stage of proceedings.[5] *See Palladino ex rel. U.S. v. VNA of S. New Jersey, Inc.*, 68 F. Supp. 2d 455, 476 (D.N.J. 1999) (Simandle, J.) (rejecting defendants' argument regarding truth of allegedly defamatory statements, reasoning that "this is a motion to dismiss, and not a summary judgment motion"). Accordingly, the defamation counterclaim is sufficiently alleged to withstand the instant motion.

### IV. Motion to Strike Affirmative Defense

#### a. Standard of Review

The Court next turns to Hotaling and Sanniti's motion to strike the "first sale" affirmative defense. Pursuant to Rule 12(f), the Court may, upon motion or *sua sponte*, "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). Although "the decision to strike a defense is left to the Court's discretion, Rule 12(f) motions are not favored." *Martin v. Hudson Farm Club, Inc.*, 2019 WL 3759539, at *2 (D.N.J. Aug. 9, 2019) (Chesler, J.). Accordingly, motions to strike "will generally 'be denied unless the allegations have no possible relation to the controversy and may cause prejudice to one of the parties, or if the allegations confuse the issues.'" *Onyejekwe v. Uber Techs., Inc.*, 2020 WL 2832566, at *2 (D.N.J. June 1, 2020) (Salas, J.) (quoting *Garlanger*

---

[5] The Court notes that this ruling does not constitute a finding that Hotaling and Sanniti's statements to Amazon were "*per se* defamatory." (Opp. Br. at 12-14.) *See Wilco Trading LLC v. Shabat*, 2021 WL 1146634 (M.D. Fla. Mar. 8, 2021) (court found that defendants had committed "defamation *per se* by making false complaints to Amazon that Plaintiff was selling counterfeit goods" while addressing default judgment, not Rule 12(b)(6), motion); *Beauty USA, Inc. v. Chin Hong Luo*, 2011 WL 4952658 (S.D.N.Y. Oct. 13, 2011) (addressing defamation claim arising from purportedly false statements to plaintiffs' customers and others in industry, not to Amazon); *El-Ghazzawy v. Berthiaume*, 708 F. Supp. 2d 874, 879-80 (D. Minn. 2010), *aff'd*, 636 F.3d 452 (8th Cir. 2011) (finding that complaints regarding counterfeit goods which rose to level of criminal conduct amounted to defamation *per se*).

13

*v. Verbeke*, 223 F.Supp.2d 596, 609 (D.N.J. 2002) (Brotman, J.)); *accord Eagle View Techs., Inc. v. Xactware Sols., Inc.*, 325 F.R.D. 90, 95 (D.N.J. 2018) (Kugler, J.) ("[A]n affirmative defense can be stricken only if the defense asserted could not possibly prevent recovery under any pleaded or inferable set of facts." (internal citations and quotations omitted)).  To that end, the Third Circuit has cautioned that district courts "should not grant a motion to strike a defense unless the insufficiency of the defense is clearly apparent."  *Cipollone v. Liggett Grp., Inc.*, 789 F.2d 181, 188 (3d Cir. 1986) (internal citations and quotations omitted).

### b. Discussion

EMC and Supreme Suppliers have asserted an affirmative defense under the "first sale" or "exhaustion" doctrine on grounds that their Luxardo cherries are not materially different than those authorized for sale in the United States by Girolamo, the trademark owner.  (D.E. 27, Answer at 9.)  Under the "first sale" doctrine, "a trademark owner's authorized initial sale of its product into the stream of commerce extinguishes the trademark owner's rights to maintain control over who buys, sells, and uses the product in its authorized form."  *Iberia Foods Corp. v. Romeo*, 150 F.3d 298, 301 n. 4 (3d Cir. 1998).  However, trademark owners have "the right to enjoin the sale of products containing the owner's authentic mark when the products offered for sale are similar but not identical to those offered by the trademark owner."  *Id.* at 302.  Accordingly, if products sold by the alleged infringer (here, EMC and Supreme Suppliers) are materially different than those of the trademark owner (here, Girolamo), then "the alleged infringer's goods are considered 'non-genuine' and the sale of the goods constitutes infringement."  *Id.* at 302-03.  It follows, then, that products without material differences are "genuine," and in such cases an action for infringement cannot lie.  *Id.* at 303.  *Accord Rockwell Automation, Inc. v. Radwell Int'l*, Inc., 2019 WL 7288946, at *8 (D.N.J. Dec. 30, 2019) (Kugler,

14

J.) ("[T]he 'material differences' jurisprudence that excludes unauthorized gray goods from the first sale doctrine . . . is alive and well.").

Hotaling and Sanniti move to strike the "first sale" affirmative defense on grounds that the "first sale doctrine is decidedly *not* a defense to a charge asserting unfair competition based on the sale of materially different gray market goods." (Mov. Br. at 14.) They rely on a passage from a trademark law and unfair competition legal treatise which echoes the position set forth in *Iberia* and *Rockwell* and provides as follows:

> Under the "first sale" or "exhaustion" rule, the resale of genuine goods does not constitute trademark infringement. *But the first sale or exhaustion rule is no defense to a charge of infringement by the unauthorized sale of gray goods, because the rule only exempts the resale of genuine goods that are identical to those authorized for importation into the United States.* This is only logical, because if one applied the "first sale" or "exhaustion" defense to gray goods sales, the unauthorized importer would never be an infringer, because an unauthorized importer is always a reseller of goods.

McCarthy on Trademarks and Unfair Competition § 29:51.75 (Fifth Ed. 2021) (emphasis added).

According to Hotaling and Sanniti, striking the "first sale" affirmative defense "at an early stage will focus the case on the real issues at hand and prevent a waste of judicial resources on an entirely irrelevant issue." (Mov. Br. at 14.) But here again, the parties' dispute over the authenticity of Supreme Suppliers' Luxardo cherries rears its head. (*Compare* Compl. ¶¶ 1, 16, 23 (describing product as "gray market" with "material differences") *with* Counterclaim ¶¶ 32-33, 35, 44, 51, 57, 77, 107 and Answer at 9 (describing product as "genuine" and "not materially different").) The merits of whether Supreme Suppliers' Luxardo cherries are "genuine" or "materially different" than Girolamo's product await discovery. *See Malibu Media, LLC v. Does 1*, 2013 WL 1702549, at *8 (E.D. Pa. Mar. 6, 2013) (reasoning that while plaintiff's argument regarding legal unavailability of "first sale" defense "may ultimately be true, . . . it is too early for the Court to determine such at this point"). This early stage of proceedings is the wrong time

to eliminate the affirmative defense, when its insufficiency is not "clearly apparent."  *Cipollone*, 789 F.2d at 188.  The motion to strike is denied.

**V.      Conclusion**

For the foregoing reasons, the motion (D.E. 31) is granted in part and denied in part.  An appropriate order will issue.

Date: September 29, 2022

/s/ Katharine S. Hayden
Katharine S. Hayden, U.S.D.J.